AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| United States of America<br><br>v.<br><br>HANNAH GRACE WHITLOCK,<br><br>Defendant | Case No.   2:23-mj-06435-DUTY |

**CLERK, U.S. DISTRICT COURT**
**DEC 18 2023**
**CENTRAL DISTRICT OF CALIFORNIA**
**BY:        DEPUTY**

**LODGED**
**CLERK, U.S. DISTRICT COURT**
**12/18/2023**
**CENTRAL DISTRICT OF CALIFORNIA**
**BY:   coo   DEPUTY**

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about December 16, 2023, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/ Joseph DeLuca
Complainant's signature

Joseph DeLuca, HSI Special Agent
Printed name and title

Attested to by the applicant in person in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
Judge's signature

City and state:  Los Angeles, California        Hon. Patricia Donahue, U.S. Magistrate Judge
                                                Printed name and title

AUSA: Sarah S. Lee, x7407

## AFFIDAVIT

I, Joseph DeLuca, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1. I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so employed since August 2021. My duties involve conducting and participating in criminal investigations of individuals and businesses for possible criminal violations of Titles 8, 18, 19, and 21 of the United States Code. I earned a Bachelor of Business Administration in Accounting from Temple University. Before my employment with HSI, I worked as an Asset Protection manager for Target Corporation. My duties included conducting investigations into financial fraud, employee misconduct, theft, and organized retail crime.

2. In May 2022, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. During this training program, I completed approximately 350 hours of instruction, including classes involving the study of constitutional law, search and seizure, surveillance, and a variety of other law enforcement related classes. In September 2022, I graduated from the Homeland Security Investigations Special Agent Training program at the Federal Law Enforcement Training Center in Glynco, Georgia. During this training, I completed approximately 350 hours of training in the following subject matter areas: immigration law, customs laws, money laundering,

search and investigative techniques, human trafficking and human smuggling, contraband investigations, and other program areas for which HSI bears responsibility.

3. During the course of my employment with HSI, I have participated in over thirty investigations that involve drug trafficking. Through my training, experience, and interaction with other law enforcement officers, I am familiar with the methods employed by individuals involved in drug trafficking and how they use digital devices to facilitate and conceal their crimes.

## II. **PURPOSE OF AFFIDAVIT**

4. This affidavit is made in support of a criminal complaint against Hannah Grace WHITLOCK ("WHITLOCK") for a violation of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute a controlled substance).

5. This affidavit is also made in support of an application for a search warrant for a black iPhone with no case and significant damage to the back of the phone, bearing IMEI number 350725913619316, seized from WHITLOCK during her arrest (the "SUBJECT DEVICE"), that is currently in the custody of HSI, in Los Angeles, California, as described in Attachment A.

6. The requested search warrant seeks authorization to seize evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute a controlled substance) and 846 (conspiracy to distribute a controlled substance) (the "Subject

Offenses"), as described more fully in Attachment B. Attachments A and B are hereby incorporated by reference.

7. Unless otherwise stated, the facts set forth in this affidavit are based upon my personal observations; my training and experience; oral and written reports about this investigation; and physical surveillance conducted by federal agents or local law enforcement agencies, which has been reported to me either directly or indirectly. Unless otherwise noted, when I assert that a statement was made, I have either heard the statement directly or listened to a recording of the statement, or the statement was reported to me by another law enforcement officer, either directly or in a written report. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III. SUMMARY OF PROBABLE CAUSE

8. On December 16, 2023, HSI Special Agents arrested WHITLOCK when she attempted to smuggle approximately 29 kilograms of suspected cocaine on an aircraft set to depart from Los Angeles International Airport ("LAX") to London Gatwick Airport ("LGA") in the United Kingdom. At the time of her arrest, WHITLOCK had the SUBJECT DEVICE in her purse.

## IV. STATEMENT OF PROBABLE CAUSE

9. Based upon my personal participation in this investigation, my own observations, and my discussions with other federal and local law enforcement officers, I know the following:

### A. CBP Stopped WHITLOCK Before She Boarded a Flight to London

10. On December 16, 2023, at approximately 5:00 PM, PST, I received a call from United States Customs and Border Protection ("CBP") at LAX. CBP stated that they had conducted an inspection of Hannah Grace WHITLOCK. CBP conducted an inspection of WHITLOCK because a subject record lookout was placed on her by HSI agents based in John F. Kennedy International Airport's ("HSI JFK") office. HSI JFK had placed a record lookout on WHITLOCK because HSI JFK had received information that WHITLOCK was a possible co-conspirator in a narcotics smuggling investigation.

11. CBP stopped WHITLOCK while she attempted to board Norse Atlantic Airways flight number Z0 712 at Gate 207, which was scheduled to depart at 4:25 PM, PST, from LAX to LGA in the United Kingdom. CBP told me that they escorted WHITLOCK to the baggage inspection area of Tom Bradley International Terminal. At the time CBP stopped WHITLOCK, WHITLOCK's checked luggage, a light blue suitcase, was in the process of being loaded onto the airplane. CBP retrieved the luggage before it was loaded onto the airplane and inspected it. According to CBP, they asked WHITLOCK if the blue suitcase belonged to her and WHITLOCK

4

stated that it did. The suitcase also had a luggage tag with WHITLOCK's name on it. CBP asked WHITLOCK if she had packed the suitcase herself, and WHITLOCK confirmed that she did.

### B. CBP Searched WHITLOCK's Suitcase and Found Suspected Cocaine

12. According to CBP, CBP then opened and searched the suitcase. The suitcase contained women's clothing, a beach towel, and six black vacuum-sealed bags. Five of the black bags contained four bricks each of suspected cocaine. One of the black bags contained five bricks of suspected cocaine. CBP asked WHITLOCK what was inside the black bags, and she claimed she did not know.

13. CBP field-tested the substances in the black bags using a Gemini testing device, and the bricks tested positive for cocaine. The total weight of the suspected cocaine, including packaging, was approximately 29.22 kilograms. CBP subsequently seized the 29.22 kilograms of suspected cocaine.

### C. HSI Agents Attempted to Interview WHITLOCK

14. After CBP seized the suspected cocaine, HSI Special Agent Collin Murphy and I responded to LAX to examine the evidence and attempt to interview WHITLOCK. At approximately 7:10 PM, PST, Special Agent Murphy and I read WHITLOCK her Miranda rights and WHITLOCK invoked her right to an attorney. We then explained why we were investigating her and terminated the interview at approximately 7:18 PM, PST. Agents subsequently arrested WHITLOCK.

15. At the time of her arrest, WHITLOCK had with her a small black purse which contained a black iPhone bearing IMEI number 350725913619316, along with approximately $6,900 in U.S. currency; a black carry-on suitcase containing women's clothing and makeup; a white tote bag containing snacks; and the checked bag that contained the suspected cocaine.

16. HSI agents saw the suitcase that contained the suspected cocaine was light blue in color and bore a luggage tag with WHITLOCK's name and flight information. HSI agents also noticed that one of the wheels were missing on the suitcase. Inside of WHITLOCK's purse that she had with her at the time of the CBP inspection was a suitcase wheel that appeared to match the wheels on the checked bag that had the suspected cocaine concealed inside.

**D.   WHITLOCK's Recent Flight Activity**

17. After I spoke with WHITLOCK, agents conducted a review of WHITLOCK's prior border crossings. CBP border crossing records indicate WHITLOCK's first international travel took place on May 20, 2021. Records detailed two international trips from 2021 to 2023 before there was a noticeable increase in travel. Border crossing information reported five trips for WHITLOCK from July 2023 through December 2023. In that five-month period, WHITLOCK's travel history included trips to Amsterdam, London, Brussels, Paris, and Frankfurt. WHITLOCK's trips in this period have been short, ranging from two to five days in length.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

18. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

7

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

19. As used herein, the term "digital device" includes the SUBJECT DEVICE.

20. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

21. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

22. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

23. For all the reasons described above, there is probable cause to believe that WHITLOCK violated Title 21, United States Code, Section 841(a)(1) (Possession with Intent to Distribute a Controlled Substance).

24. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT DEVICE, as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 18th day of
December, 2023.

THE HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE